Good afternoon everyone. Welcome to the Illinois Appellate Court, First District's Provision. We'll ask that the attorneys who are going to argue, please step up together and tell us who you are and who you represent. Good afternoon, Your Honors. Joe Sippert, on behalf of the appellant, the Northern League of Professional Baseball Teams,  and just for the record, that's S-I-P-R-U-T. Good afternoon, Your Honors. My name is Adam Voss, on behalf of the defendants. All right, thank you, counsel. We'll allow about 20 minutes for each side of 10 minutes extra for rebuttal. We may extend that or reduce it if things become repetitive or if we have a lot of questions. So please try to get your most important points first. We have heard the police and are familiar with the facts, so you need not dwell on those. All right, Mr. Sippert, you may proceed when you're ready. Thank you, Your Honor. Thank you, Your Honors, and may it please the court. As I said, I'm Joe Sippert on behalf of the Northern League of Professional Baseball. I'd like to spend just a few minutes perhaps on the context and the background of the underlying case, which I think frames a lot of the issues, and then hopefully spend most of my time talking about a few of the big picture legal issues, which I think are very much before this court. In 2004, the Northern League of Professional Baseball was an independent professional sports league, unaffiliated from Major League Baseball. So it wasn't a big, deep pocket with lots of resources. It was entirely disconnected from what we think of as real professional baseball. In 2004, there were around 12 teams. That number varied over the years, sometimes more, sometimes less. The league no longer exists. But if you ever heard of the Schomburg Flyers or a club out in Zion or Rockford, that was all the Northern League at one time. So in 2004, there was a point when multiple teams in the league decided to leave. And there was nothing that could be done about that at that time, and it was quite disastrous. And part of what this case is about is the general practice in sports leagues to have what is generally called exit fees to prevent teams from leaving or to make sure that if they do leave, there's money paid. And, of course, it's obvious, I suppose, why that is so important, because when you have a league of X number of teams, when teams leave, it's very bad for everyone else. And the smaller the league is, the more that is true. So, for example, if the NFL has, whatever it is today, 30 teams, give or take, if that number were six, one would surmise that the value of the league would be much less because people don't care about six teams playing. It gets boring when the same teams play each other. So... Mr. Stupert, this case comes to us from after a full jury trial. Yes. And what you are raising as assignments of error relate to admission of particular elements of evidence. Yes, sir. Admission or non-admission of those elements of evidence in an effort to try to overturn the jury's verdict. Yes. Now, one of the things that you just sort of led me into was the exit clause issue, which is the underlying legal malpractice, that the contract did not have an exit clause. And don't we have testimony from some owners who said, I wouldn't have signed had there been an exit fee, because this sort of works both ways. Some owners may say, well, in the back of my mind, maybe I do want to dump out of this league, so I don't want to agree to a million dollar exit fee. Yes, Your Honor. Thank you for raising that issue. It ties into a lot of relevance of a lot of the evidence you're talking about in your brief. Absolutely. And I would characterize this as one of probably three big picture issues that are before this court on appeal. On that issue, by the way, de novo review attaches, because it's a legal question. Putting aside what we would characterize as the circumstantial evidence component of that, I mean, in 2004 and 2007, as I started to say, there were multiple instances of where teams left and no one could do anything about it. So in 2009, when the league decided to try to take action, the idea that those teams wouldn't have agreed to the very thing that had proven to be their demise twice before is not credible. But the legal issue, more importantly, is that the trial court decided that you could not have, well, to put it a different way, the trial court decided that the four departing teams could say, I wouldn't have signed it anyway. And Illinois law is directly to the contrary, it turns out. It doesn't work that way. We cited some cases, the case of Linton versus Chicago Motor Club. In particular, you have to have personal direct knowledge, which in this case means the contract has to actually exist. The case that was relied on by the trial court was King Coyle, in which there was no contract. So, excuse me, in which there was a contract. So what I'm saying is that it's a bit of a nuanced point. It's an important point. If you have a situation where the contract that you want to have been drafted, that the plaintiff is saying should have been drafted, if you have that situation, you cannot then have witnesses get up and say, well, if such a contract had ever been drafted, I never would have signed it. That's exactly where the case law says you can't go. That's improper speculation. And the trial court, I think, got confused on that point because if the contract had been drafted, if there was an actual contract that had been submitted or drafted during the underlying time period, then it is permissible under Illinois law for witnesses to at least say, however credible or uncredible for the jury to decide, but to at least say in that case, no, I wasn't going to sign that, or I didn't sign it for a specific reason. So that's the legal error that was committed by the trial court, and I think quite important to get corrected now as a matter of Illinois law. But, you know, putting aside that, you know, what you just mentioned, what are the numbers like on this? Were there enough owners who testified that way that they would have been a majority and therefore prevented the league from entering into the contract that you believe should have been drafted? Yeah, this is the part. Your Honor, again, gets to the question of where this clause went wrong. The way the exit fee was supposed to work is that a team wants to lead the league. Okay, you can do that, but you have to write a check for X dollars. In this case, it was a million dollars. Instead, what we got was what the defendants characterized as an expulsion provision, or what I think the agreement says is an expulsion provision. And the problem with that, as a replacement for the exit fee, is that it doesn't allow you to accomplish the intended objective. And the reason for that is because as the departing teams left and the remaining teams said, wait a second, you owe $4 million, $1 million each if you're going to do that, they said, nope, number one, we're not departing, we're just taking a vacation for a year. We're going on hiatus for a year, and so it's not really a departure. Number two, we need a hearing. You can't expel us and trigger a $1 million payment unless we have a hearing under the agreement. Number three, no expulsion is possible here because you, the league, need a quorum in order to even have expulsion. And quorum is not possible under the terms of the agreement because four of the teams are still league members. In other words, as of the moment when you're leaving or going on hiatus and being accused of owing the money, they're saying, no, we're still members of the league. There's four of us, there's four of you, you need a quorum. So if you're going to accuse us of expulsion, you would need a quorum. You don't have it because you only have four of the eight teams. And moreover, they said at that time, even if we're wrong, and a quorum could be reached by having the four remaining teams constitute a quorum of four under an interpretation of whether they're actually still members or not, if that were the case, the departing team said, then we would expel you because we could be a quorum of four. So you owe us a million dollars. To which the response was, what? That's crazy talk. I mean, that can't be right. How can you leave the league, go on hiatus or whatever you want to call it for a year, and say that not only do you not owe any money, but technically, if anything, we would owe you money under the same theory. That can't be right. Well, of course, that's the issue. That's why it's a problem. The departing teams were quite right in their interpretation of what was going to go down and how things were going to play out. They exploited the agreement, and they understood it well. To their credit, I suppose. I mean, they were led by Pat Salvey, a very well-known Illinois attorney, a very smart attorney, who owned one of the teams, and then when they left, took a good look at the contract as it was drafted and said, no, I don't think so. I don't think we owe him this money. Perhaps any one of us would have done the same in that situation. But the problem is not that. The problem is the agreement that allowed him to take that position. That's why malpractice occurred, fundamentally. And we have a trial, an expert witness, who is the guy in the United States on this exact issue. For 40 years, he's taught and practiced sports law and league agreements and exit fees, who says, yeah, this is why you've got to have an exit fee provision in your contract. So this is all getting to the point of why the malpractice occurred. The legal error, tying this, Your Honor, to the big picture legal issues that emerge here from this trial, are, number one, as we talked about briefly, the trial court's admission of testimony that the four department teams never would have signed that agreement. If the exit fee provision had been drafted, that the plaintiffs say should have been drafted, we, the department teams, never would have signed it. It was a manifest legal error to allow that testimony in. That's number one. Number two, barring our main witness, the representative of Northern League himself, Rich Ehrenreich, barring him from testifying as to why he chose not to sue the department teams was, again, clear legal error and really, really devastating for us at trial because it went to the issue of proximate causation. One of the defendants' main arguments that they have raised throughout this entire case, and certainly during the trial, is that none of this matters because the plaintiffs could have sued the department teams and chose not to. So I'm here now in the position of saying here are the arguments the department team raised when they left about why they didn't owe the money. Okay? And we've said that in our complaint since the beginning. The defendants are saying, well, wait a minute, you never even tried to sue the department teams, so how can you say that malpractice occurred when these guys left, you let them walk away, and then you signed a settlement agreement with those department teams in which you said it would be a walkaway, in which you agreed to a walkaway. How, then, can you claim that malpractice occurred because you would have just, you know, done the same thing? That was their argument. And we were not able to rebut that. And that's really, really important because it went to proximate causation at its very core. There is an answer to that question, by the way. And the answer, as Mr. Ehrenreich would have testified, and I don't want to say tried to testify, but would rather exist, exists, you know, within the contours of the court's order. But what it is is that he got to play the hand that was dealt. Well, your opponent says that barring Mr. Ehrenreich's testimony was sort of water over the bridge because the same testimony that you believe was improperly omitted came in through other witnesses. What's your response to that argument? That can't be correct because if it were true, it would mean even if, you know, it's true that legally your main witness, the representative of the Voting League himself, even if it were true legally, he should have been allowed to say these things. The fact that the defendant cross-examined him and a little bit came out and maybe a few other witnesses said one or two things, and the fact that the judge herself asked one or two questions, yeah, that sort of got it in. So that's good enough. That can't be the rule. We don't want that to be the rule in Illinois. I mean, obviously there's a reason why it's important to have certain testimony come in with your primary corporate representative plaintiff, your main witness. I mean, to tell the story and to tell it in a way that's convincing, that's not to say you couldn't also do those other things, but it's not an adequate replacement. So if the court is persuaded that, yeah, Mr. Ehrenreich needed to explain this or should have been allowed to explain that, I don't think it's correct to say it's a harmless error. The reason why, again, it's so important for Ehrenreich to say this is because he would have answered the question why we didn't sue. And, again, it's playing the hand we're dealt. They were trying to salvage their season at that point. They have four teams out of eight. They're talking to every other league that they can and saying, hey, can we do something? Can we do a joint venture? Can we come in and figure out how to play some games together so this isn't a total disaster? I mean, they're not having a season with four teams. And every team they talked to said, no way, you're not touching me with a ten-foot pole if you've got this potential litigation with the departing teams. And, meanwhile, you've got a legal analysis, subjectively, of the arguments at that time with even the loan lawyer basically saying, you guys are not in a good position here. So what were they supposed to do? I mean, they had to do the walk-away agreement. If not for the malpractice, then it would have been an entirely different story. And then, if the departing teams had done the same thing, if they would have left and said, we dare you to do something about it, and then they were in the same sort of, you know, trick box where they have to choose between litigation or actually playing baseball, then they can choose litigation because they actually have a winning hand. So that's why this testimony is so critical, and they weren't able to get it in. The other thing that's quite important, I think, as a matter of Illinois law, which is going to be a real problem if the court's ruling is allowed to stand, is the erroneous jury trial instruction saying that, well, in our view, which basically makes transactional malpractice almost impossible to occur. There was a legal, or excuse me, jury trial instruction by the trial court, not an IPI, in very much overall objection, in which the trial court says, in construing the Northern League agreement at issue, you should try to reconcile conflicting clauses in the agreement. And, you know, if there's two clauses that seem to conflict, then, you know, the more specific clause should apply. That should never have been a jury instruction because it basically instructs the jury to disregard the malpractice. If we're correct that the malpractice occurred with these various contractual provisions that sort of created this opportunity for the departing teams to avoid paying the fee, if we're correct about that in the first place, and that's what the case is about, you can't have a jury trial instruction saying, I instruct you, the jury, to reconcile those competing provisions because that's like saying I'm instructing you to determine that no malpractice occurred and that there was no screw-up. The trial judge was confused or conflated at two different things. There is a rule of contract construction, which is that parties to a contract, when interpreting a contract, right, must construe potentially competing provisions in that way. And that's where she got that from, of course. Did you provide the trial court an IPI instruction to be given instead? On that point? Yes. Well, I think that that sort of came out of nowhere. So it wasn't an issue of what do you guys think about this? It was that the defendants urged that to come in and the trial court wanted it to come in. I honestly can't remember exactly what the dialogue was. In our position, it wasn't so much a counterproposal. It was more, no, that instruction itself should not be in any shape or form. It's flat wrong. The trial court confused the issue of contract construction. Well, how did the non-IPI improperly or did not convey the correct principles? Well, because in a legal malpractice case, it's fundamentally incorrect that the general principle of contract construction should be used as a jury instruction for what to do with two competing provisions that on their face are mutually exclusive. In other words, that's what this whole case is about, is that we have a contract that was drafted with provisions that were ill-suited for their intended purpose. It wasn't well drafted. So it's one thing to look at that contract sort of in real time and say, well, under the general principle of contract construction, before we go accusing each other of conflicting provisions, let's try to reconcile these. It's one thing to do that. It's another thing when you're trying a malpractice case about that contract to have a jury instruction saying you have to decide or you are instructed to reconcile these competing provisions. Okay, the non-IPI said, quote, When construing a contract such as the legal agreement, the contract should be read so as to give effect to all provisions wherever possible. In addition, when two clauses of a contract conflict, the more specific clause should apply. Right. So how is that instruction not clear? Well, I'm not sure our challenge is that it was unclear. It perhaps was very clear. It was just erroneous. How did it not accurately state the prevailing law? Because the jury, it is not the case that in a legal malpractice case, the jury is to be instructed to reconcile competing provisions. Because the reason why that is is because if you say that in the jury instruction, the jury goes back and says, well, we've got provision A, which says one thing, and we've got provision B, which says completely the opposite of that, that doesn't seem right. But we've got a jury instruction which says we have to reconcile those two competing provisions and to give way to the more specific one. So therefore, I'm not, I, the juror, I'm not troubled that this seems to make no sense because B is more specific than A, so we're going to go with B. I mean, that's what they're thinking in the jury room, whereas our argument was. . . I think what you're trying to tell us, if I understand your position, is that construction of a contract is a legal issue solely for the court and not for the jury. Correct. Yes, that's exactly right. Your position is that the judge should have presented a construction of the contract according to her viewpoint and then presented that to the jury somehow. Say, this is what the contract is under my interpretation. Well, yeah, I mean, all of that is still different from what happened, which is translating it just directly into a jury instruction. I mean, it's not the law. In other words, there's no, in legal malpractice cases in Illinois, there is no support for the idea that that jury instruction comes in and that the jury has to decide that issue. I mean, if that were the case, then every time there's transactional malpractice, every time a contract lawyer is hired to draft a contract and literally screws it up in whatever way, shape, or form, they're going to have a jury instruction that says, well, you know, if you, the jurors, think that there's some tension here between all these different provisions, you've got to reconcile it by giving way to the more specific. It's just, that's not supposed to happen. You've got about a minute left. In addition to those big picture legal issues, there are a host of rulings on expert testimony that I don't think it would be inaccurate to say, on virtually every contested issue, the trial court ruled in favor of the defendant and ruled against the plaintiff. Now, that doesn't make it wrong, but it's a fair summary of all the sub-issues that come in under this expert testimony box. I think that the standard is abuse of discretion, not de novo. But the two main problems I'd like to just call attention to with my 60 seconds is that our expert, Lee, who I think is, like I said, the guy in the country, testified at length in his deposition, or excuse me, in his disclosures and so forth, and at his deposition also talked about the fact that he has experience spanning decades and he's looked at all these different Lee agreements. The defendants took the position that he could only talk about seven agreements, not the 40 that were part of his disclosures, because at his dep, only seven specific ones had been mentioned. Well, that doesn't mean that he can't say at trial he's looked at 40 agreements. And that distinction is important because there's a big difference between seven agreements and 40, a big difference between a handful, the guy who's encountered this stuff, and the guy who's like the number one person in the world on this exact issue who has done nothing but this for the last three decades. I mean, we weren't able to argue that because the trial court decided, well, at his deposition, it wasn't asked about, or the defendant asked about it and only asked about seven. It's not like the defendant said, now I'm asking you, are there any more than these seven? Tell me now. And he said, no, there's no more, and then we were contradicting him. Okay, so the trial court just got it wrong there, but the consequences were disastrous. And finally, Lydig, defendant's expert, never once, by his own admission, handled an exit fee clause in a sports agreement, never once drafted a sports league agreement, and could barely even say that he ever drafted a liquidated damages provision. He actually sort of hedged and said, well, I was involved with some drafting, which means what? He was a first-year associate at a firm that did a contract at some point in time. I mean, he's not qualifying. And on that basis, the court should have kept him out. All right. Thank you for your argument, and we'll call you back for rebuttal shortly. Thank you, Your Honors. Mr. Vaughn. Good afternoon. May it please the Court. This appeal arises at a jury trial that lasted for three weeks, and the jury took two hours to return a defense verdict. All the issues that have been raised are evidentiary rulings, which are decided and reviewed under the abuse of discretion standards. So in order for plaintiff to prevail, he needs to show, one, that the trial court committed an error,  a reasonable judge would have made that same decision, and, three, not only that, that there is substantial prejudice that affected the outcome of the trial. Plaintiff cannot reach that in this appeal, because very simply the evidence clearly would have established, even if plaintiff was allowed to exclude all the evidence that they suggest and include all the evidence that suggests, the evidence still would have shown that there was neither a breach of the standard of care nor a proximate cause. Specifically, first, with a legal malpractice claim, you have four elements. You have the duty, the breach, causation, and damages. Basically, the issue at trial was the standard of care and the proximate cause. Proximate cause, there was two arguments raised. The first is that the owners would not have agreed to an exit fee provision had it been included into the draft. The second is, even if the exit fee had been included to the draft and had been accepted, that there would not have been an immediate check signing that would have occurred when the split happened between the Northern League. Below, Mr. Einhardt referred to it as a Hobson's choice, where the teams that he owned, plus other teams he was aligned with, either had to decide to litigate or they had to join another league that couldn't do both. And they decided, because of the way the contract was written, they had no choice but to go on to the other league and do a walk-away. But this happened in September, October of 2009, when the league would have started, March of 2009. So we're talking a five-month window here. And you have two competing sides of this issue. The side led by, say, Mr. Salley was saying that it is in fact Mr. Einhardt and there was a line with him who had left the league, because they had been negotiating with the American Association to join their league. And then when there was a vote, Joliet said, I need 14 hours to decide. And then it said that Joliet, Rockford, Lake County, and Schaumburg had decided to go to the Frontier League. So at that time, both sides decided to hire lawyers, send letters, saving out the positions. So even if there had been an exit fee, nobody would have just said, oh, there's an exit fee, I'm just going to write you a check for a million dollars. I mean, that would have been litigated. A million dollars is a lot of money, and especially under the circumstances, even had such a fee been in there, such a liquidated damage provision been in there, they would have gone to court and they would have been had to litigate. So Hobson's choice still exists. And there's clear evidence that Joliet could have determined to figure out that that, in fact, is what would have happened, because there was the agreement of eight that Mr. Einhardt himself had drafted, which contained a purported exit fee, and two teams left while that was operative, and litigation ensued. And eventually, the Northern League walked away from it. They collected no money from the other side. And so the jury was able to actually see that an exit fee provision was in existence and teams left. What happened? Litigation ensued. So the jury could have found Hobson's choice that existed whenever the teams left under the contract would have also existed under the contract had there been a so-called exit fee, and so the result would have been the same. There would have been a walkaway. Nobody would have collected. People wouldn't have just pulled out checkbooks and started writing million dollars to the Northern League because there was an exit fee. I mean, people would have litigated that. But furthermore, the trial court was correct to allow the evidence of the two owners who said, I never would have signed that. That was Mr. Salvey and Mr. Katz. The agreement was written, but with six owners in mind, and Mr. Leach, Mr. Leach didn't even draft the first draft of this. It was actually Mr. Griffin, who was an attorney, who was the commissioner of the League, who made the first draft. There wasn't any liquidated damages provision in his draft. Mr. Leach did it, and it was drafted with the expulsion fee. Mr. Salvey testified expulsion was important because, you know, they wanted to have a damages provision so long as there was some sort of finding that there was improper conduct. It wasn't just an automatic, but it had to be you did something wrong. But he submitted a draft, and this is to all six members who make up the Northern League. He's not representing one party necessarily against another. He's trying to draft a contract on behalf of all the owners that they come to an agreement on, and he submits it, and the first response that comes back is from Mr. Tom, who said that he disagrees with any liquidated damage provision at all, that he thought the agreement of aid had actually caused the Northern League a lot of damage and made it unattractive for new teams to come in. The owner was disgusted, and eventually Mr. Tom agreed to a million-dollar liquidated damage provision. Then Mr. Eierreich, who's the person who says, oh, this was all about having an NSF fee, and who had drafted the agreement of aid, who had been a practicing attorney in Chicago, had a good law firm, was a contract real estate attorney. He sent back significant revisions onto Mr. Leach's draft, and he included provisions within Article 10 and did nothing, said nothing about an exit fee. In fact, the only time an exit fee seems to arise as an issue is when the complaint in this case is filed. Prior to that, none of the owners were talking about an exit fee. None of the owners were stating that the idea was to have an exit fee versus an expulsion fee, having a vote in order to kick members out of this, an automatic fee to be collected. The agreement was before them. It was a business term, and the entire time, nobody's discussed an exit fee. So on that alone, the court should have fallen. Now, let me ask you to address your issue about standing. I think you contend that the League doesn't have standing to bring this lawsuit in the first place because it was basically dissolved. But we know dissolved corporations can pursue collection of debts that might be owed to them. Correct. Can you flesh that out for us a little bit? Sure. So when the complaint was filed, there was a motion to dismiss, and, of course, the court could inform on any basis in the record. And there was an argument made that there was no Northern League because the only team at that time in existence claiming to be in the Northern League was the Lake County team that was owned by Mr. Ironright. The argument was made that while Chamba doesn't exist, but it's in windup, and so it can wind up its affairs. And the argument was made, well, it can wind up its affairs, but this is the Northern League's affairs, but the judge allowed the complaint to go through. But at trial, Mr. Ironright testified, and he was asked by a counsel on direct examination, does the, you know, are you in the business of baseball anymore? And he said no. Both teams were dissolved. Both teams are out. I think the exact statement is, so you're 0 for 2. That's correct. So at the time of trial, the Northern League, which is a voluntary association, which means it has to be, you know, two or more members, there are no members that exist that claim that they make up the Northern League. So at trial it came out that the Northern League, such as it was, can no longer exist because there are no teams to make it up. And so that's why they say there's no standing because the Northern League is not an entity that is in existence. A nonexistent entity can't bring a lawsuit. So who's in the driver's seat then? It sounds like Mr. Ironright. Yeah, that's right. He was on the Lake County team. He was the last team standing. He was the last team standing, but he also had a part of Schaumburg. But interestingly, as part of the walk-away, Mr. Ironright had a $400,000 promissory note, which was owned to the Northern League because of part of a purchase of Lake County. And he had actually been at a fine of $1,000 that had eventually been imposed, which was running as part of the walk-away that was forgiven. So $400,000 plus $1,000 that was forgiven, and then he's coming in and trying to sue the lawyers. Let me ask you also to address the jury instruction point. It does seem a little strange. First of all, we've got a non-IPI instruction, which is fine. We can have non-IPI instructions as long as they accurately state in Illinois law. And I think we can agree that the construction of the contract instruction probably stated in Illinois law rather accurately, but isn't that an issue for the court rather than for the jury? And didn't that mess things up by putting that task into the wrong hands? Well, first, I mean, I think it correctly stated Illinois law. But I don't think that – I think the judge could have perhaps said, you know, it's a matter of law, here's – I mean, that's in fact what she's doing. She's instructing as a matter of law to the jury, here's how you read a contract. But the plaintiff had put it into that issue because, you know, the argument was that, well, you have the expulsion agreement, and Section A says that termination, you can expel. And so all you have to do is have the majority of the voters or the non-disinterested parties can then expel and then claim a liquidated damages provision. Well, the four teams that support, you know, we'll call them the remaining teams, they never did that, and there was this issue of, well, do we have a quorum? Do we need a quorum? And so they had the section that says if you do business, you have to have a quorum, and then you have the section that says that if you're going to terminate, you just have to have a majority of the disinterested members. And so the argument was that, well, you could have gone ahead and tried to get this, you know, stated that there was this expulsion fee that was owed, and it didn't. So I think when plaintiff injected that, then it leaves the jury a question of, well, how does this contract work? I think it was proper for the judge to instruct the jury that if you find that there are two provisions that exist and you're making a determination on whether or not, you know, Mr. Eiderreich was correct in feeling that there was, you know, there was no point in litigating, that's how you would resolve it. But to the extent that, you know, there was any error in it, I mean, it is harmless because we have a general verdict, and we don't know why the jury ruled the way it did. It could have been because that there wasn't the standard of care. Then we had the experts. It's a battle of the expert. We had Mr. Carfagna, and we had Mr. Weidig. The argument against them is that, well, they're not experts because Mr. Carfagna never did unaffiliated leads. And, I mean, that goes into credibility. It hasn't been judged so far because we're really, we're not faced with an appeal where it's based on, you know, lack of a prima facie case or anything. They're arguing as to the admission or not admission of particular elements of evidence. Right. But they're arguing that experts shouldn't have been allowed. And I'm saying that, you know, they should have been allowed and that that could have been the reason that the jury decided that, you know, Mr. Leach did absolutely nothing wrong. I mean, as our experts stated, he presented a draft. He communicated with the parties. It was the party's decision to make the business terms. He had excellent communication. There was no discussion of exit fees. You know, it wasn't his responsibility to say, you need this fee versus that fee. And so they could have determined that there was no breach. And so however the contract read, it didn't matter because he found that it was presented correctly. So, I mean, even if you look at what the case would look like without the evidence that they want and with the evidence they're in, I mean, it still is a simple verdict for the defense. There was the agreement of eight which had a purported exit fee. That was in evidence. It was in evidence that there was litigation on it and no money was collected. There was the evidence that Mr. Griffin wrote the first draft which had no exit fee. Mr. Tom rejected the liquidated damages provision entirely. It was then reduced. Mr. Einrike, who was drafted the agreement of eight, who was the only one who testified on behalf of the plaintiff, he committed significant amounts of revisions and never brought an exit fee. There was no mention during any of this of the exit fee. And then there's the post split up, the lawyers' letters back and forth clearly indicated there was going to be litigation as there was with the agreement of eight. So there's no evidence to suggest there was a breach of the standard of care because there's simply, I mean, Mr. Lee, as Mr. Counsel said, is the guy, but actually he's an accountant. He didn't actually start, even though he's had a law license since 78, he didn't actually start practicing law until 2001. All of his experience on behalf of sports leagues and sports teams was as an accountant. So to the extent that Mr. Weiner and Mr. Carfagna are allowed to be an expert because they don't have the specific sub-specialty of sports law and affiliate law, Mr. Lee really didn't even have the sub-specialty of being a lawyer dealing with contracts in law. So, you know, there's a lot of conflict between some of their arguments. You know, if we don't have an expert in, their expert shouldn't have been qualified. But it really comes down to the fact that this was a three-week jury trial. It took two hours for the jury to decide. The trial court's rulings were eminently reasonable. I think they're all correct, but they certainly weren't an abuse of discretion. So based on the record before any arguments were raised, we would ask that the court affirm. Thank you. Is this a quick reply or a follow-up? Thank you again, Your Honors. A couple of quick points in response. We don't agree that the abuse of discretion standard applies to all the issues here, if I heard that correctly. It certainly applies to some, but not all. And in particular, I think it's clear and probably beyond dispute that as to the issue about the jury instruction, it's to know their review, not abuse of discretion. There are a lot of issues here. Of course, we really only need to prevail on one to have a remand occur. But there are quite a lot of very significant rulings that were made by the trial court, which we believe are not consistent with Illinois law and which will do violence, frankly, to a lot of settled Illinois law and a lot of points. The fact that the defense counsel just now spoke at length in his comments about the Hobson's choice point, about the Hobson's choice faced by the league and how had we gotten a different contract, the same thing would have still happened. This illustrates exactly why that is so important and why it was so important for us at trial to get that testimony in. Here we are now, years later, and half of his oral argument time is about, well, it wouldn't really matter because Mr. Ehrenreich would have done this or that. That's what we were talking about at trial. That's what the jury needed to hear is what is the answer to that. And we couldn't give an answer because the trial court said, I'm not allowing it. It's hearsay and it constitutes speculation, legal conclusions, and it's out. That was just clear error that absolutely cut our legs off at the trial on the key issue of proximate cause. On the standing point, I just want to clarify that the Norman League, as an operating entity, of course doesn't exist because the league went out of business after all this happened, and many of the teams, unfortunately, went out of business. But as I think Your Honor pointed out correctly, that doesn't mean that you can't have claims brought by the entity that represents those interests on behalf of the league. The status, just to be clear, about who is doing what here, Mr. Ehrenreich owns two teams of the four that remained. There were two other team owners and two teams. Just so everyone knows, and I'm not sure how developed this is in the record because it was not really challenged by the defendants, but those guys have an arrangement. So it's not like this is Mr. Ehrenreich's brainchild and that he's the only one who cares and he's the one who's doing this. The four remaining teams have an arrangement and a mutual interest in the recovery of damages in this litigation. Mr. Ehrenreich became very quickly the sort of point person because he owned two of the four teams and, frankly, because he's a lawyer. So, you know, he drew the short straw. But it's no different than any other situation when a corporate interest goes out of business and then whatever's left has to bring the claims on behalf of those interests in whatever shape or form. And one can imagine, I think, the public policy that would emerge from this if the ruling were that malpractice perhaps had occurred and damages perhaps ensued. And as a direct result of those damages, the whole league and all of its teams went out of business. And because they're out of business, they can no longer recover damages for that malpractice. I mean, that can't be right. I'd be pleased to answer any other quotes the court may have. Thank you very much. Thank you very much. The court will just take the matter under advisement. Thank you. The court is going to recess for a few moments for a panel change because the other two cases are randomized to different justices. So with that, we will stand adjourned.